# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

| | |
|---|---|
| TRINITY PRINT & MEDIA, INC., <br> A Florida corporation, VIBEY.COM, LLC, <br> a Florida limited liability company, and <br> TURTLE MEDIA GROUP, LLC, <br> a Florida limited liability company. <br><br> Plaintiffs, <br><br> v. <br><br> ROMAN ROMANYUK, an adult <br> individual, MIRZA POLOVINA, an adult <br> individual, RUCKUS VENTURES LLC, <br> a Washington limited liability company, <br> and PREZNA LLC, a Washington <br> limited liability company, <br><br> Defendants. <br> _____/ | Case No. 8:23-cv-00449-MSS-JSS |

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Defendants, Roman Romanyuk ("Romanyuk"), Mirza Polovina ("Mirza"), Ruckus Ventures LLC ("Ruckus"), and Prezna LLC ("Prezna") (collectively "Defendants") by and through their undersigned counsel, submit this response in opposition to Plaintiffs' Trinity Print & Media, Inc. ("Trinity"), Vibey.com, LLC ("Vibey"), and Turtle Media Group, LLC ("Turtle") (collectively "Plaintiffs"), Motion for Preliminary Injunction (Dkt. 2 and Dkt. 13)[1] ("Plaintiffs' Motion").

---

[1] Plaintiffs originally filed a Motion for Temporary Restraining Order and Preliminary Injunction that was denied without prejudice. (Dkts. 2, 12.) Plaintiffs thereafter filed a Motion for Preliminary Injunction. (Dkt. 13.) This response is filed in opposition to both motions.

This opposition is supported by the Declarations of Roman Romanyuk ("Romanyuk") (Dkt. 26-1), Mahir Polovina ("Mahir") (Dkt. 26-2), and Paritosh Singh ("Singh") (Dkt. 26-3), all of which were filed on April 4, 2023.

## I. SUMMARY OF ARGUMENT

Defendants have complied with all aspects of the Agreements between the parties. This includes adhering to any restrictive covenants within the Agreements. Plaintiffs were fully aware that Defendants owned and operated several competing businesses (e.g., Ruckus and Prezna) and websites (e.g., FunnyAnd.com) and that Defendants intended to continue doing so following the execution of the Agreements. It is for this reason that non-compete clauses are conspicuously absent from the Agreements. The Plaintiffs' Memorandum of Law (Dkt. 14) and the supporting Declaration of Noam Poupko ("Poupko") (Dkt. 14-1) are riddled with false, misleading, and unsupported allegations. These allegations are aimed at deflecting blame from Poupko's poor performance in running the companies purchased by way of the Agreements. Poupko, for example, fundamentally changed several aspects of the businesses and ignored several best practices recommended by Defendants. All of this resulted in the substantially weaker financial performance referenced in Plaintiffs' Motion.

## II. BACKGROUND

### A. Trinity's Purchase of Vibey and Turtle.

This case concerns Trinity's purchase of Vibey and Turtle. Vibey and Turtle run websites that provide news and entertainment content. Vibey runs Worldlifestyle.com and Turtle runs lifebuzz.com. (Dkt. 26-1 at ¶ 25.) The content of these websites, in turn, generates advertising revenue via a type of on-line advertising known as display advertising. Display advertising uses images, text, and videos to promote products and services on third-party websites, apps, and social media. The advertisements and articles located around the periphery of many popular websites are the result of display advertising. Advertisers generate revenue when users click through to access the advertiser's website. The content of both Worldlifestyle.com and lifebuzz.com generates revenue via display advertising.

Vibey and Turtle were sold to Trinity via two separate "LLC Membership Unit Sale and Purchase Agreements." (Dkts. 1-1 and 1-2) (collectively, the "Agreements"). Vibey was sold to Trinity by Romanyuk, while Turtle was sold to Trinity by both Mirza and Romanyuk. (*See id.*). The Agreements were entered into on September 23, 2022 and each include a separately executed "Non-Solicitation and Confidentiality Agreement" as an exhibit. (Dkts. 1-1, 1-2 at Ex E.) Paragraph 6 of each Non-Solicitation and Confidentiality Agreement, in turn, contains what Plaintiffs' Motion refers to as a "Contractor Covenant" that prohibits Romanyuk from soliciting or hiring certain individuals from Vibey or Turtle for a period of three years. (*See id.*) Both of

the Agreements likewise include as an exhibit an unsigned listing of "Assets" that Plaintiffs allege constitutes a "Content Covenant." (Dkts. 1-1, 1-2 at Ex. A.) The listed assets generally include the articles and images found on Worldlifestyle.com and lifebuzz.com as of the date of the Agreements. The Content Covenant precludes Romanyuk from using this content for a period of one year. Plaintiffs' Motion alleges breaches of both the Contractor Covenant and the Content Covenant.

### B. Romanyuk's Competing Advertising Businesses.

Prior to being sold to Trinity in September of 2022, Romanyuk was involved in running both Vibey and Turtle. (Dkt. 26-1 at ¶ 5.) Notably both before and after the Agreements, Romanyuk, who is a serial entrepreneur, was involved in running other advertising businesses. (Dkt. 26-1 at ¶ 42.) Romanyuk has been the sole owner of Ruckus since October of 2017, and he has been the General Partner of Prezna since January of 2016. (Dkt. 26-1 at ¶¶ 6-7.) Ruckus and Prezna are engaged, either directly or indirectly, in display advertising. At the time the Agreements were negotiated, Plaintiffs were fully aware that Romanyuk had other advertising businesses. (Dkt. 26-1 at ¶ 42.) Plaintiffs were also aware that Romanyuk operated competing websites such as FunnyAnd.com. (Dkt. 26-1 at ¶ 9.) It is precisely for this reason that the Agreements do not include any non-compete provisions. (*See id*.) The Agreements do not preclude Romanyuk from running businesses engaged in display advertising, such as Ruckus and Prezna. Nor do the Agreements preclude Romanyuk from running competing websites, such as FunnyAnd.com. Romanyuk would not have executed any

agreements precluding him from engaging in these activities. Plaintiffs understood all of this and willingly proceeded with the purchase of Vibey and Turtle. (Dkt. 26-1 at ¶ 42.)

Plaintiffs allege Defendants are violating the Content Covenant by publishing fourteen articles on FunnyAnd.com with media that is identical, or nearly identical, to the media found on the website operated by Vibey (i.e., Worldlifestyle.com.) (Dkt. 14-1 at ¶ 13.)[2] Although some of the articles share some similarities, many have no similarities whatsoever. For example, Articles 4, 7, 8, 11, and 13 attached as Exhibit 6 to the Complaint are not at all similar. (*See, e.g.*, Dkt. 1-6.) More importantly, each of the fourteen articles was published on FunnyAnd.com *before* being published on Vibey. (Dkt. 26-1 at ¶ 45.) The fourteen articles were also published on Worldlifestyle.com *after* the execution of the Agreements in September of 2022. Thus, these fourteen articles could not possibly have been included within the Content Covenant of the Agreements. At a minimum, with the slightest due diligence, Defendants could have reviewed FunnyAnd.com prior to executing the Agreements to discover much of the content they are now complaining about. Finally, because the fourteen articles were published on FunnyAnd.com *before* being published on Worldlifestyle.com, Plaintiffs' claims of copying or copyright infringement are wholly without merit. (Dkt. 26-1 at ¶ 46.)[3] If anything, the timing suggests copying by the Plaintiffs.

---

[2] Defendants also dispute that the provision relied upon by the Plaintiffs constitutes a covenant. Florida Statute § 542.335 requires any covenants to be signed, and Exhibit A to the Agreements is unsigned.
[3] Furthermore, in selling Vibey and Turtle, Defendants specifically disclaimed any copyright ownership. (Dkts. 1-1 and 1-2 at ¶ 5.6.)

### C. Defendants have Not Hired or Solicited Plaintiffs' Media Buyers.

Plaintiffs also allege that media buyers Mahir and Singh are working with the Defendants in violation of the Contractor Covenant. (Dkt. 14 at p. 12.) Yet, for this allegation, Plaintiffs offer only the outdated LinkedIn profiles of Mahir and Singh. (Dkt. 14 at p. 12.) This allegation is flatly contradicted by the Declarations of Romanyuk, Mahir, and Singh. (Dkts. 26-1, 26-2, and 26-3.) Namely, Romanyuk unequivocally states that neither Mahir nor Singh work as media buyers for the Defendants and that they have not been recruited to do so. (Dkt. 26-1 at ¶¶ 52-56.) Mahir corroborates this by stating he has not worked as a media buyer for any of the Defendants since the execution of the Agreements and has not been recruited to do so. (Dkt. 26-2 at ¶¶ 6-8.) Singh likewise states that he has not worked as a media buyer for any of the Defendants since the execution of the Agreements and has not been recruited to do so. (Dkt. 26-3 at ¶¶ 5-7.) The entirety of Plaintiffs' claim with respect to the Contractor Covenant is based upon outdated LinkedIn profiles. (Dkt. 26-2 at ¶¶ 14-15; Dkt. 26-3 at ¶¶ 12-13.) Mahir and Singh have since updated their LinkedIn profiles to reflect their current employment as media buyers for Worldlifestyle.com and their past employment with Prezna.[4] Given that Mahir and Singh worked for the Plaintiffs at the time Plaintiffs' Motion was filed, the failure to confirm this assertion, which is critical to Plaintiffs' Motion, is breathtaking. Had Plaintiffs made any effort to substantiate this claim, it would not have been presented to the Court.

---

[4] https://in.linkedin.com/in/paritosh-singh-34853a122 (Last Visited April 11, 2023).
https://www.linkedin.com/in/mahir-polovina-972a38a7 (Last Visited April 11, 2023).

### D. "Preznataboola" Is Not a Media Buyer.

Plaintiffs also allege that the URLs from Defendants' articles demonstrate that they were obtained from the same media buyer. (Dkt. 14 at p. 12.) Specifically, Plaintiffs reference a specific article from FunnyAnd.com that includes a reference to "utm_medium=Preznataboola" in the URL. (*See id.* at Ex. 5.) Plaintiffs claim that this is evidence that FunnyAnd.com and Worldlifestye.com are using the same media buyer. This is incorrect. "Preznataboola" was included in the identified URL as part of a "Urchin Tracking Module" or "UTM." A UTM is a parameter within a website address that allows on-line marketing campaigns to be tracked. In this case, "Prezna" is a reference to Romanyuk's business Prezna LLC which is a software tool that websites use for creating and managing their advertising campaigns. And "Taboola" references the company that provides the advertising networks for on-line media. (Dkt. 26-1 at ¶ 47.) Putting these terms together results in "Preznataboola." Contrary to Plaintiffs' allegations, it does not reflect a specific media buyer. (Dkt. 26-1 at ¶ 47.)

Likewise, the Defendants did not conceal the names of their media buyers. (Dkt. 26-1 at ¶ 50.) Noam Poupko ("Poupko"), Trinity's Vice President of Digital Marketing, knew that Mahir Polovina and Mirza Polovina are brothers. (Dkt. 26-1 at ¶ 48; Dkt. 26-2 at ¶¶ 17, 18.) Poupko likewise knew that Oksana Romanyuk is a cousin of Romanyuk. (Dkt. 26-1 at ¶ 49.) Plaintiffs' allegation that these relationships were hidden by omitting the last names of the media buyers in the exhibits to the Agreements is likewise unfounded. (Dkt. 14 at p. 12.) A review of the relevant exhibit demonstrates that very little detail is provided regarding any of the media buyers. (Dkt.

1-1 at p. 19.) The exhibit does not reference any last names and references others simply as "assistants" or "agency staff." (*See id.*)

E.   **Poupko's History of Mismanagement.**

Plaintiffs argue that the alleged breaches negatively impacted the financial performance of Vibey and Turtle. (Dkt. 14 at p. 11.) The reality is that Poupko's financial mismanagement is responsible for the financial condition of the companies.

Following the sale of businesses, Poupko purposely ignored several best practices recommended by Romanyuk. (Dkt. 26-1 at ¶ 10.) Poupko also has a history of failed businesses and a personal bankruptcy. (*See id.* at ¶¶ 11-12.) At least two of Poupko's previous businesses failed (e.g., Z Lifestyle LLC and Ads Direct Media, Inc.). (Dkt. 26-1 at ¶ 13.) For the first several weeks following the sale, Poupko and Roman were in frequent communication, but two months after the sale, Poupko was in total control of both Vibey and Turtle. (Dkt. 26-1 at ¶ 27.) During the transition period, Poupko exhibited sloppy, unorganized, and careless behavior. (Dkt. 26-1 at ¶ 28.)

Prior to being owned by Vibey, Worldlifestyle.com was run by Poupko. (Dkt. 26-1 at ¶ 14.) Under Poupko's management, the website suffered from mismanagement and poor performance. (*See id.* at ¶ 15.) Romanyuk was brought in by Poupko on a contract basis to help stabilize the website. (*See id.*) Poupko was ultimately unable to pay Romanyuk for his services in this regard. (*See id.* at ¶ 16.) It is for this reason that in May of 2020 Vibey purchased Worldlifestyle.com from

Poupko. (*See id.* at ¶ 17.) Poupko's debt to Romanyuk was forgiven as part of this transaction. (*See id.* at ¶ 19.) Worldlifestyle.com was profitable almost every month following its purchase by Romanyuk and Vibey. (*See id.* at ¶¶ 20-21.) Later in 2022, Poupko sought to purchase Worldlifestyle.com back from Romanyuk with the help of investor Gurjot Batra. (*See id*. at ¶ 22.)

Following his reacquisition of the website, Poupko made fundamental changes to the site that negatively impacted its financial performance. (Dkt. 26-1 at ¶ 30; Dkt. 26-2 at ¶¶ 19-20.) As just one example, in November 2022, Poupko changed Worldlifestyle.com from a paginated layout to an infinite scroll layout. (Dkt. 26-2 at ¶ 36.) An infinite scroll layout allows users to scroll infinitely through the article without having to click on a navigation button. (*See id.*) A paginated layout entails showing a navigation button at the bottom of each slide which directs the reader to the next page of the article. (*See id.*) Defendants previously ran a paginated layout which was directly responsible for the success with the website. (*See id.*) Paginated layouts result in higher revenue per session (RPS) and in turn higher advertising rates. (*See id.*) Infinite scroll layouts have a lower RPS because of lower advertising rates. (*See id.*) When Poupko introduced an infinite scroll layout, the advertising rates fell dramatically. (*See id.*) Another example involves Poupko's refusal to scan for or block malicious high click through advertisers. (Dkt. 26-1 at ¶ 34.) Poupko also began targeting consumers outside of the United States, such as consumers in Canada, U.K., and Australia, all of which pay much lower advertising rates than the United States.

(Dkt. 26-1 at ¶ 37.) It is for these reasons, and not any imagined breaches, that the companies are not as profitable as anticipated.

## III. PRELIMINARY INJUNCTION STANDARD

A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly carries the burden of persuasion. *Am. Civil Liberties Union of Fla., Inc. v. Miami–Dade County Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009). A party seeking a preliminary injunction under Fed. R. Civ. P. Rule 65(a) must demonstrate each of the following: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) that the threatened injury to the movant outweighs the harm an injunction may cause the nonmovant; and (4) that granting the injunction is not adverse to the public interest. *See Storehouse Credit Union, EK. For. v. Cusumano*, 2010 WL 11508264, at *4 (M.D. Fla. July 26, 2010) (*citing Church v. City of Huntsville*, 30 F.3d 1332, 1342 (11th Cir. 1994)).

"If the movant is unable to establish a likelihood of success on the merits, a court need not consider the remaining conditions prerequisite to injunctive relief." *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002) (*citing Pittman v. Cole*, 267 F.3d 1269 (11th Cir. 2001)). "Because a preliminary injunction is 'an extraordinary and drastic remedy,' its grant is the exception rather than the rule, and plaintiff must clearly carry the burden of persuasion." *See United States v. Lambert*, 695 F.2d 536, 539 (11th Cir. 1983) (*quoting Texas v. Seatrain International, S.A.*, 518 F.2d 175, 179 (5th Cir.1975)).

## IV. PLAINTIFFS CANNOT PREVAIL ON THEIR CONTRACT CLAIMS

### A. The Undisputed Evidence Establishes That Defendants Did Not Breach Any Restrictive Covenants.

Plaintiffs' Motion is replete with factual inaccuracies. These factual inaccuracies are fatal to Plaintiffs' claims, and at a minimum, they preclude the possibility of injunctive relief.

A party moving for preliminary injunction carries the burden of persuasion as to each of the four prerequisites and must come forward with facts in support of its claims. *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (per curiam) (*quoting McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998)). In cases where the facts underlying the claim are contested, the court should hold an evidentiary hearing to resolve factual disputes and make necessary credibility determinations. *See McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1312 (11th Cir. 1998). A court cannot issue a preliminary injunction in the face of disputed issues of fact. *See id.* Trial courts are also precluded from considering as fact unproven statements documented only by attorney statements. *See Blimpie Cap. Venture, Inc. v. Palms Plaza Partners, Ltd.*, 636 So. 2d 838, 840 (Fla. Dist. Ct. App. 1994).

Plaintiffs' factual inaccuracies are both numerous and substantial. Plaintiffs allege, for example, that Defendants breached the Content Covenant by copying fourteen articles from Worldlifestyle.com and thereafter publishing them on FunnyAnd.com. (Dkt. 14 at p. 13.) This claim is false and based upon grossly inaccurate publication dates. (Dkt. 26-1 at ¶ 45.) The correct publication dates

demonstrate that the fourteen articles in question were published first on FunnyAnd.com and only later on Worldlifestyle.com. (*See id.*) Plaintiffs also allege that Defendants breached the Contractor Covenant by hiring Mahir and Singh as media buyers. (Dkt. 14 at p. 12.) Again, this claim is false and based upon outdated LinkedIn profiles. The Declarations of Mahir and Singh demonstrate that they are not working with the Defendants as media buyers and that their LinkedIn profiles were simply not updated to reflect their current employment. (Dkt. 26-2 at ¶¶ 11-15; Dkt. 26-3 at ¶¶ 10-12.) Plaintiffs allege a further breach by claiming that a reference to "preznataboola" in the URL of an article on FunnyAnd.com somehow references a specific media buyer. (Dkt. 26-1 at ¶ 47.) This claim is likewise false as "preznataboola" is not a media buyer. (*See id.*)

It is respectfully submitted that Plaintiffs have not come forward with the facts necessary to carry their burden of persuasion. Plaintiffs' Motion must therefore be denied.

### B. There Are No Legitimate Business Interests Supporting the Content Covenant.

In addition to the aforementioned factual errors, Plaintiffs' Motion is also premised on an unenforceable Content Covenant. Plaintiffs' interpretation of the Content Covenant as precluding the dissemination of publicly available articles renders it void and unenforceable.

A party seeking to enforce a restrictive covenant under Fla. Stat. § 542.335 must plead and prove: (1) the existence of one or more legitimate business interests justifying

the restrictive covenant; and (2) that the contractually specified restraint is reasonably necessary to protect the established interests of the employer. *N. Am. Prod. Corp. v. Moore*, 196 F. Supp. 2d 1217, 1228 (M.D. Fla. 2002). The statute defines "legitimate business interests" as trade secrets, valuable confidential business information, substantial relationships with specific prospective or existing customers, customer goodwill, and extraordinary or specialized training. *See* Fla. Stat. § 542.335(1)(b). Any restrictive covenant not supported by such a legitimate business interest is unlawful, void, and unenforceable. *In re Maxxim Med. Grp., Inc.*, 434 B.R. 660, 684 (Bankr. M.D. Fla. 2010).

"[I]nformation that is commonly known in the industry and not unique to the allegedly injured party is not confidential and is not entitled to protection." *Autonation, Inc. v. O'Brien*, 347 F. Supp. 2d 1299, 1304 (S.D. Fla. 2004) (*citing Anich Indus., Inc. v. Raney*, 751 So. 2d 767, 771 (Fla. 5th DCA 2000)); *see also, Keel v. Quality Medical Systems, Inc.*, 515 So. 2d 337 (Fla. 3d DCA 1987) (information commonly known in the industry and not unique to allegedly injured party is not "confidential" and thus not entitled to protection); *Blackstone v. Dade City Osteopathic Clinic*, 511 So. 2d 1050 (Fla. 2d DCA 1987) (customer lists which can be compiled from readily accessible sources not protected). Thus, information that is commonly known, publicly available, or not unique to the injured party cannot form the basis of a legitimate business interest under Fla. Stat. § 542.335. *See Autonation,* 347 F. Supp. 2d at 1304.

In the present case, the undisputed evidence demonstrates that the fourteen articles featured in Plaintiffs' Motion were published first on FunnyAnd.com and only

later on Plaintiffs' website. (Dkt. 26-1 at ¶45.) The articles are not unique to the Plaintiffs. Furthermore, there is nothing at all confidential or secret about articles used for display advertising. Indeed, the very purpose of display advertising is to publicly disseminate media as far and wide as possible. The articles at issue were designed to be and are widely available to the public. There can be no legitimate business interest in now trying to restrict the dissemination of these articles.

In view of the public and non-confidential nature of the articles at issue, Plaintiffs cannot establish the legitimate business interest necessary to enforce the Content Covenant.

### C. Plaintiffs Have Not Described the Alleged Trade Secrets with Reasonable Particularity.

Plaintiffs' Motion makes only a cursory and passing reference to the alleged trade secrets. The paltry details provided are grossly insufficient to support a trade secret misappropriation claim.

A claim of trade secret misappropriation requires a showing that: (1) the plaintiff possessed secret information and took reasonable steps to protect its secrecy; and (2) the secret it possessed was misappropriated. *See RxStrategies, Inc. v. CVS Pharmacy*, Inc., 390 F. Supp. 3d 1341, 1351 (M.D. Fla. 2019) (discussing the elements under both the Florida Statutes and the Defend Trade Secrets Act). Regarding the first element, a plaintiff must demonstrate both the specific information it seeks to protect is secret and that it has taken reasonable steps to protect that secrecy. *See Am. Red Cross v. Palm Beach Blood Bank, Inc.*, 143 F.3d 1407, 1410 (11th Cir. 1998). Information generally known

or readily accessible to third parties cannot qualify for trade secret protection. *See id.* Simply calling something a "protected trade secret" does not make it so. *Cornell Pump Co. v. Thompson Pump & Mfg. Co., Inc.*, 2017 WL 10059025, at *4 (M.D. Fla. Dec. 22, 2017). Rather, the party asserting a trade secret must demonstrate its claim with evidence. *See id.*

The party asserting trade secret protection must also describe the alleged trade secrets with reasonable particularity. *See Levenger Co. v. Feldman,* 516 F. Supp. 2d 1272, 1287 (S.D. Fla. 2007). Reasonable particularity requires more than generic descriptions of categories, such as a list of components to which the alleged trade secrets relate. *See Jabil Inc. v. Essentium, Inc.*, 2020 WL 708140, at *4 (M.D. Fla. Feb. 12, 2020) (discussing reasonable particularity in the context of the Defend Trade Secrets Act). A court will not enforce vaguely defined trade secrets. *See Levenger,* 516 F. Supp. 2d at 1287.

Here, Plaintiffs claim as a trade secret "native advertising campaigns" and the associated "profit metrics." (Dkt. 14-1 at ¶ 5.) No further details are offered regarding how an advertising campaign, which is necessarily public, can possibly constitute a protectable trade secret. Nor do the Plaintiffs provide any details regarding what it means by a "profit metric." (Dkt. 14-1 at ¶ 5.) These terse descriptions are at most "descriptions of categories" and do not satisfy the requirement of "reasonable particularity." *See Jabil Inc*, 2020 WL 708140, at *4. Plaintiffs' Motion should be denied for this reason.

Even if Plaintiffs can establish the existence of trade secrets, they have not directly alleged any misappropriation by the Defendants. At most, Plaintiffs *infer* that Defendants are using the asserted trade secrets because the fourteen articles at issue were known to be the "highest performing content" of Vibey. (Dkt. 14-1 at ¶ 13.) In other words, Plaintiffs are guessing that trade secrets have been misappropriated based upon the selection of the fourteen articles. (Dkt. 14-1 at ¶ 13.) But guesses and inferences cannot serve as a stand-in for a direct claim of misappropriation. Moreover, any claims of misappropriation are belied by Defendants' prior publication of the fourteen articles in question. Plaintiffs' claim that Defendants are "stealing" Plaintiffs' "highest performing content" is simply wrong as a factual matter. (Dkt. 14-1 at ¶ 13.)

Plaintiffs have not described the alleged trade secrets with any particularity, nor have they directly alleged any misappropriation. Plaintiffs' Motion must therefore be denied.

## V. PLAINTIFFS CANNOT CLAIM IRREPARABLE INJURY

Contrary to Plaintiffs' arguments, they are not entitled to a presumption of irreparable injury. Rather, their delay in seeking injunctive relief undercuts any claim that the injury is irreparable.

Plaintiffs' Motion relies upon the presumption of irreparable injury associated with restrictive covenants as detailed in § 542.335(1)(j). (Dkt. 14 at p. 21.) However, this Court recently determined "that § 542.335(1)(j)'s presumption of irreparable harm conflicts with traditional federal equity practice and does not govern in a federal

diversity action for a preliminary injunction." *Blue-Grace Logistics LLC v. Fahey*, 340 F.R.D. 460, 466 (M.D. Fla. 2022). Instead, a movant must prove irreparable harm without the presumption afforded by Florida law. *See id.* Plaintiffs likewise cannot rely upon the "Equitable Relief" provision in the Non-Solicitation and Confidentiality Agreement. (Dkt. 14 at p. 10.) This is because courts have an obligation to independently ensure that each element for injunctive relief is met. *See B&G Equip. Co., Inc. v. Airofog USA, LLC*, 2019 WL 1974835, at *5 (M.D. Fla. Apr. 5, 2019), *report and recommendation adopted*, 2019 WL 2537792 (M.D. Fla. June 20, 2019) (noting that contractual provisions regarding entitlement to injunctive relief are accorded little to no weight). Again, Plaintiffs must independently demonstrate irreparable injury.

In this regard, "[a] delay in seeking a preliminary injunction of even only a few months … militates against a finding of irreparable harm." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016). "A preliminary injunction requires showing 'imminent' irreparable harm." *Id.* (*citing Siegel*, 234 F.3d at 1176-77). "Indeed, the very idea of a preliminary injunction is premised on the need for speedy and urgent action to protect a plaintiff's rights before a case can be resolved on its merits." *Id.* "[A] party's failure to act with speed or urgency in moving for a preliminary injunction necessarily undermines a finding of irreparable harm." *Id.*

Of the fourteen articles at issue in this case, the first was published on FunnyAnd.com on or about December 14, 2020. (Dkt. 26-1 at ¶ 45, Article No. 5.) Nine of the fourteen articles were published on FunnyAnd.com before the Agreements were executed on September 23, 2022. (Dkt. 26-1 at ¶ 45, Article Nos. 1, 2, 3, 4, 5, 6,

9,10, and 14.) Plaintiffs are seeking to prevent the Defendants from publishing articles that they have successfully published without incident for nearly four years. They are likewise seeking to enjoin activities that have been ongoing since the day the parties executed the Agreements, a period of nearly seven months. This substantial delay (whether measured from the earliest publication date or the date of the Agreements) undermines any assertions that the alleged injuries are irreparable or that the claimed injuries cannot be remedied via monetary damages.

Plaintiffs are not entitled to a presumption of irreparable injury and Plaintiffs' substantial delay demonstrates that there are no irreparable injuries at play. The absence of irreparable injury represents a separate and distinct basis for denying the Motion.

## VI. THE PUBLIC INTEREST AND RELATIVE HARMS FAVOR DEFENDANTS

The Florida Legislature has determined that, as a matter of public policy, a restrictive covenant lacking a legitimate business interest "is unlawful and is void and unenforceable." *See* Fla. Stat. § 542.335(1)(b). Furthermore, in the absence of a valid restrictive covenant, a contract "in restraint of trade or commerce in [Florida] is unlawful." *See* Fla. Stat. § 542.18. As explained in Section IV(b) *supra*, Plaintiffs cannot demonstrate a legitimate business interest in preventing the continued publication of widely disseminated advertising content. Because a legitimate business interest is lacking, enforcing the Content Covenant via the requested injunction would constitute an unlawful restraint of trade. Hence, public policy weighs heavily against issuing the

requested injunction. Issuing the requested injunction would also rewrite the Agreements to include something they decidedly lack; namely, non-compete provisions. Preventing the Defendants from engaging in lawful competition would cause significant injury and hand the Plaintiffs a benefit they are not contractually entitled to.

## VII. A SUBSTANTIAL BOND SHOULD BE REQUIRED IN THE UNLIKELY EVENT PLAINTIFFS' MOTION IS GRANTED

"The court may issue a preliminary injunction … only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65. In the unlikely event Plaintiffs' Motion is granted, Defendants request that a sizable bond be posted, far more than the $5,000 proposed by the Plaintiffs. To the extent needed, and depending upon the scope of any injunction issued, Defendants request leave to file additional declarations and briefing to substantiate the exact size of the bond requested.

## VIII. CONCLUSION

For the foregoing reasons, it is respectfully submitted that Plaintiffs' Motion for Preliminary Injunction (Dkt. 13) should be denied.

Dated: April 12, 2023

/s/ *Robert E. Johnson*
Robert E. Johnson, Lead Counsel
Florida Bar No.: 342955
Michael J. Colitz, III
Florida Bar No. 164348
Emily M. Heim
Florida Bar No. 1015867
GrayRobinson, P.A.
401 East Jackson Street, Suite 2700
Tampa, FL 33602
Telephone: (813) 273-5000
Facsimile: (813) 273-5145
Primary Email:
robert.johnson@gray-robinson.com
Secondary Email:
deborah.cook@gray-robinson.com
*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 12th day of April, 2023, a true and correct copy of the foregoing has been filed with the Clerk of the Court and furnished via CM/ECF to:

| | |
|---|---|
| Robert K. Tucker II | Bart R. Valdes |
| Gordon Rees Scully Mansukhani LLP | DSK Law Group |
| 100 S. Ashley Drive | 609 West Horatio Street |
| Tampa, FL 33602 | Tampa, FL 33606 |
| rtucker@grsm.com | bvaldes@dsklawgroup.com |

/s/ *Robert E. Johnson*
Robert E. Johnson

#50052349 v3